**THE DLJ LAW FIRM, P.C.**
Dorian L. Jackson (Bar No. 269795)
3655 Torrance Boulevard, Suite 300
Torrance, CA 90503
Telephone: (310) 359-9203
Facsimile: (310) 359-9202
E-Mail: djackson@dljlawfirm.com

*Counsel for Plaintiffs and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN GUTIERREZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., THE INVESTMENT COMMITTEE FOR: THE KAISER PERMANENTE 401(K) RETIREMENT PLAN; THE KAISER PERMANENTE SUPPLEMENTAL SAVINGS AND RETIREMENT PLAN; THE KAISER PERMANENTE NORTHWEST SUPPLEMENTAL RETIREMENT PLAN; THE KAISER PERMANENTE SUPPLEMENTAL SAVINGS AND RETIREMENT PLAN FOR UNION GROUPS, and JOHN DOES 1-10,<br><br>Defendants. | **CIVIL ACTION NO.**:<br><br>3:25-cv-07380-JD |

## AMENDED CLASS ACTION COMPLAINT[1]

Plaintiff, John Gutierrez, by and through his attorneys, on behalf of the Kaiser Permanente 401(k) Retirement Plan (the "401(k) Plan"), the Kaiser Permanente Supplemental Savings and Retirement Plan (the "Supp. Plan"), the Kaiser Permanente

[1] Plaintiff files this Amended Class Action Complaint pursuant to Text Only Order approving the Parties' request to set deadlines. *See* ECF No. 25 ("plaintiff Gutierrez may file an amended complaint by January 30, 2026").

Northwest Supplemental Retirement Plan (the "NW Supp. Plan"); and the Kaiser Permanente Supplemental Savings and Retirement Plan for Union Groups (the "Union Plan") (collectively, the "Plans"[2]), himself and all others similarly situated, states and alleges as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, Kaiser Foundation Health Plan, Inc. ("Kaiser" or the "Company"), and the Investment Committee for: the 401(k) Plan; the Supp. Plan; the NW Supp. Plan; and the Union Plan ("Investment Committee") (collectively, the Company and the Investment Committee are referred to as the "Defendants") for breaches of their fiduciary duties.

2. The Plans are defined contribution retirement plans or money purchase plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enable eligible participants to make tax-deferred contributions from their salaries to the Plans.

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (*en banc*) ("*Tibble II*"); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

4. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers"

[2] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not parties. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and its participants.

and monitoring same. *See* "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble II*, 843 F.3d at 1197-98 (quoting Restatement (Third) of Trusts, § 90, cmt. b).[3]

7. Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8. The Supreme Court has reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-lookat-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

9. At all times during the Class Period, the Plans had over twenty-one billion dollars in assets under management. At the start of the Class Period in 2020, the 401(k) Plan had $16,177,676,925, the Supp. Plan had $4,523,681,952, the Union Plan had $483,700,083, and NW Supp. Plan had $44,644,881 in assets under management. *See* 2020 Form 5500s for the 401(k) Plan, Supp. Plan, Union Plan and NW Supp. Plan, Schedule H, at 2. Collectively, the Plans had over $21.2 billion in assets under management in 2020.

10. By 2024, the Plans had $29,103,465,649 in assets under management. At the end of 2024, the 401(k) Plan had $22,541,089,460, the Supp. Plan had $5,667,619,665, the Union Plan had $833,379,477, and the NW Supp. Plan had $61,377,047 in assets under management. *See* 2024 Form 5500s for the 401(k) Plan, Supp. Plan, Union Plan and NW Supp. Plan, Schedule H, at 2. Collectively, the Plans had over $29.1 billion in assets under management at the end of 2024.

11. The Plans' assets under management qualifies them collectively as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.

12. The Plans are also large in terms of the number of their participants. At the beginning of the Class Period in 2020, the 401(k) Plan had 144,298 participants, the Supp. Plan had 48,263 participants, the Union Plan had 9,930 participants, and the NW Supp. Plan had 460 participants. *See* 2020 Form 5500s for the 401(k) Plan, Supp. Plan, Union Plan and NW Supp. Plan, at 2. Collectively, the Plans had 202,951 participants in 2020.

13. By 2024, the 401(k) Plan had 176,765 participants, the Supp. Plan had 50,907 participants, the Union Plan had 15,455 participants, and the NW Supp. Plan had 514 participants. Collectively, the Plans had 243,641 participants in 2024.

14. With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain interest income fund in the Plans with a lower rate of return when compared to available similar or identical investments with higher rates of return.

15. Specifically, Defendants allowed substantial assets in the Plans to be invested in the KP Interest Income Fund (the "KP Fund"), that provided significantly lower rates of return than comparable stable value funds that Defendants could and should have made available to participants in the Plans.

16. Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiff, and to the other participants of the Plans by, *inter alia*, maintaining the KP Fund in the Plans despite the availability of similar, better performing investment options.

17. A prudent fiduciary would not have maintained this underperforming investment option.

18. Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

19. Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I) and failure to monitor fiduciaries (Count II).

## II. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

21. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

22. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

**Plaintiff**

23. Plaintiff, John Gutierrez ("Gutierrez"), resides in Pasadena, California. During his employment, Plaintiff Gutierrez participated in the Supp. Plan. Mr. Gutierrez invested in the KP Fund in the Supp. Plan during the Class Period and suffered injury to his Plan account due to the significant underperformance of the KP Fund. In particular, Mr. Gutierrez had a balance of $11,063.93 in the KP Fund as of October 1, 2020.

24. Plaintiff has standing to bring this action on behalf of the Plans because he participated and invested in the Supp. Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

25. Further, Plaintiff has standing to bring this action on behalf of the Plans even if he only participated in one of the Plans because "[a]n individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Fallick v. Nationwide Mutual Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998);

*see also Dann v. Lincoln Natl. Corp.*, 708 F.Supp.2d 481, 487 (E.D. Pa. 2010); *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003) ("Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class."). As the Eighth Circuit has recognized, "a plaintiff may be able to assert causes of action which are based on conduct that harmed him, but which sweep more broadly than the injury he personally suffered." *Braden*, 588 F.3d at 592.

26. Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

27. Kaiser is the Sponsor for the Plans with a principal place of business at One Kaiser Plaza, Oakland, California. *See* 2024 Form 5500s for the 401(k) Plan, the Supp. Plan, the Union Plan, and the NW Supp. Plan, at 1. Kaiser is a non-profit organization that provides services under the Kaiser Permanente name.[4] Kaiser "underwrites the Permanente Medical Groups, which, through the care of over 11,000 physicians, furnish medical care to Kaiser Permanente subscribers."[5]

28. Upon information and belief, Kaiser appointed the Committee to, among other things, ensure that the investments available to the Plans' participants are appropriate and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

[4] *See* https://www.referenceforbusiness.com/history2/41/Kaiser-Foundation-Health-Plan-Inc.html (last accessed on August 13, 2025).

[5] *Id.*

29. Accordingly, Kaiser during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

30. For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

31. As discussed above, Kaiser appointed the Committee to, among other things, ensure that the investments available to the Plans' participants are appropriate and performed well as compared to their peers.

32. The Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans' assets.

33. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS[6]

34. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Kaiser Permanente 401(k) Retirement Plan, the Kaiser Permanente Supplemental Savings and Retirement Plan, the Kaiser Permanente Northwest Supplemental

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plans and all participants. *See, e.g., In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

Retirement Plan, and the Kaiser Permanente Supplemental Savings and Retirement Plan for Union Groups, at any time between January 30, 2020 through the date of judgment (the "Class Period").

35. The members of the Class are so numerous that joinder of all members is impractical. The 2020 Form 5500 for the 401(k) Plan lists 144,298 Plan "participants with account balances as of the end of the plan year." 2020 Form 5500 for the 401(k) Plan, at 2. The 2020 Form 5500 for the Supp. Plan lists 48,263 "participants with account balances as of the end of the plan year." 2020 Form 5500 for the Supp. Plan, at 2. The 2020 Form 5500 for the Union Plan lists 9,930 "participants with account balances as of the end of the plan year." 2020 Form 5500 for the Union Plan, at 2. The 2020 Form 5500 for the NW Supp. Plan lists 460 "participants with account balances as of the end of the plan year." 2020 Form 5500 for the NW Supp. Plan, at 2.

36. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in one of the Plans and has suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiff consistently with other Class members and managed the Plans as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

37. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plans;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

38. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

39. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLANS

### **The 401(k) Plan**

41. The 401(k) Plan "is a defined contribution plan which is intended to comply with the provisions of Section 401(a) and other applicable provisions of the Internal Revenue Code (IRC) and the Employee Retirement Income Security Act of 1974 (ERISA), as amended." *See* Report of Independent Auditor's ("Auditor's Report"), attached to 2024 Form 5500 for the 401(k) Plan, at 7.

42. "The purpose of the [401(k)] Plan is to provide additional retirement benefits for employees who meet specified requirements." *Id.*

43. "Participating employees may make voluntary contributions of 1% to 75% on a pretax basis." *Id.*

44. "The Employer makes contributions for certain employee groups as defined by the Plan document." *Id.*

45. Included in the 401(k) Plan's available funds was the KP Fund. *See* Auditor's Report, attached to 2023 Form 5500 for the 401(k) Plan, at 7. ("Global Trust Company and State Street Bank and Trust Company (State Street) serve as the trustee and custodian, respectively, of the KP Interest Income Fund.").

46. At the end of 2024, $1,487,870,777 in 401(k) Plan assets were invested in the KP Fund. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2024, attached to 2024 401(k) Plan Form 5500, at 14.

47. The chart below demonstrates the amount of 401(k) Plan assets invested in the KP Fund during the Class Period.

| Plan Year | 401(k) Plan Assets in KP Fund |
|---|---|
| 2020 | $1,764,430,077 |
| 2021 | $1,590,075,551 |
| 2022 | $1,717,977,648 |
| 2023 | $1,627,658,953 |
| 2024 | $1,487,870,777 |

**<u>The Supp. Plan</u>**

48. The Supp. Plan "is a money purchase plan which is intended to comply with the provisions of Section 401(a) and other applicable provisions of the Internal Revenue Code (IRC) and the Employee Retirement Income Security Act of 1974 (ERISA), as amended." *See* Auditor's Report, attached to 2024 Form 5500 for the Supp. Plan, at 7.

49. "The purpose of the [Supp.] Plan is to provide additional retirement benefits for employees who meet specified requirements." *Id.*

50. "A participant may elect to make contributions, through payroll deductions, in increments of 1% up to a maximum 10% of after-tax compensation." *Id*.

51. "The Employer contributes 5% of the compensation of participating employees after 2 years of employment." *Id*.

52. Included in the Supp. Plan's available funds was the KP Fund. *See* Auditor's Report, attached to 2023 Form 5500 for the Supp. Plan, at 7. ("Global Trust Company and State Street Bank and Trust Company (State Street) serve as the trustee and custodian, respectively, of the KP Interest Income Fund.").

53. At the end of 2024, $289,615,672in Supp. Plan assets were invested in the KP Fund. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2024, attached to 2024 Form 5500 for the Supp. Plan, at 13.

54. The chart below demonstrates the amount of Supp. Plan assets invested in the KP Fund during the Class Period.

| Plan Year | Supp. Plan Assets in KP Fund |
|---|---|
| 2020 | $376,515,627 |
| 2021 | $340,029,061 |
| 2022 | $348,651,382 |
| 2023<br>2024 | $314,731,184<br>$289,615,672 |

**The Union Plan**

55. The Union Plan "is a money purchase plan which is intended to comply with the provisions of Section 401(a) and other applicable provisions of the Internal Revenue Code (IRC) and the Employee Retirement Income Security Act of 1974 (ERISA), as amended." *See* Auditor's Report, attached to 2024 Form 5500 for the Union Plan, at 7.

56. "The purpose of the [Union] Plan is to provide additional retirement benefits for employees who meet specified requirements." *Id*.

57. "A participant may elect to make contributions, through payroll deductions, in increments of 1% up to a maximum 10% of after-tax compensation." *Id*.

58. "The Employer contributes 5% of the compensation of participating employees after 2 years of employment." *Id*.

59. Included in the Union Plan's available funds was the KP Fund. *See* Auditor's Report, attached to 2023 Form 5500 for the Union Plan, at 7. ("Global Trust Company and State Street Bank and Trust Company (State Street) serve as the trustee and custodian, respectively, of the KP Interest Income Fund.").

60. At the end of 2024, $23,229,445 in Union Plan assets were invested in the KP Fund. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2024, attached to 2024 Form 5500 for the Union Plan, at 14.

61. The chart below demonstrates the amount of Union Plan assets invested in the KP Fund during the Class Period.

| Plan Year | Union Plan Assets in KP Fund |
|---|---|
| 2020 | $27,363,304 |
| 2021 | $25,607,094 |
| 2022 | $27,096,210 |
| 2023 | $25,365,955 |
| 2024 | $23,229,445 |

**The NW Supp. Plan**

62. The NW Supp. Plan "is a defined contribution plan which is intended to comply with the provisions of Section 401(a) and other applicable provisions of the Internal Revenue Code (IRC) and the Employee Retirement Income Security Act of 1974 (ERISA), as amended." *See* Auditor's Report attached to 2024 Form 5500 for the NW Supp. Plan, at 7.

63. "The purpose of the [NW Supp.] Plan is to provide additional retirement benefits for employees who meet specified requirements." *Id*.

64. "Participating employees may make voluntary contributions of 1% to 10% of after-tax compensation." *Id*.

65. "[T]he employer contributes an amount equal to 6% of compensation for each payroll period. Each year, the employer contributes an amount equal to 50% of

the value of unused sick leave on behalf of each participant with less than 4 years of credited service, or the full value of unused sick leave on behalf of each participant with 4 or more years of credited service." *Id*.

66. Included in the NW Supp. Plan's available funds was the KP Fund. *See* Auditor's Report attached to 2024 Form 5500 for the NW Supp. Plan, at 7 ("Global Trust Company and State Street Bank and Trust Company (State Street) serve as the trustee and custodian, respectively, of the KP Interest Income Fund.").

67. At the end of 2024, $3,428,737 in NW Supp. Plan assets were invested in the KP Fund. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2024, attached to 2024 Form 5500 for the NW Supp. Plan, at 13.

68. The chart below demonstrates the amount of NW Supp. Plan assets invested in the KP Fund during the Class Period.

| Plan Year | NW Supp. Plan Assets in KP Fund |
|---|---|
| 2020 | $3,535,205 |
| 2021 | $3,149,405 |
| 2022 | $3,647,326 |
| 2023 | $3,542,194 |
| 2024 | $3,428,737 |

## VI. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLANS IN A PRUDENT MANNER

### A. ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

69. As described in the "Parties" section above, Defendants were a fiduciary of the Plans.

70. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart

from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

71. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

72. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

73. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

74. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

75. With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" like prudently managed equivalents.

76. Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[8]

77. The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

78. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

79. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

80. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

---

[8] *See* https://www,investopedia.com/terms/p/peer-group.asp (last visited Jan. 29, 2026).

81. Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

82. In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiff wrote to the Plan administrator on August 12, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plans, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

83. By letter response on December 16, 2025, counsel on behalf of the Plan's administrator responded to Plaintiff's request. No meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the KP Fund provided.

84. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any

methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

85. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

86. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the maintenance of the KP Fund in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

### B. Defendants Breached Their Fiduciary Duties by Causing the Plans to Maintain the KP Fund

#### 1. The Plans' Inclusion of the KP Fund

87. At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plans' KP Fund.

88. The investment objective of the KP Fund was "to provide current and stable income, while maintaining a stable share value of $1." Kaiser Permanente Interest Income Fund Fact Sheet, dated December 31, 2025 ("KP Fund Fact Sheet") (available at https://aemdam.assets.vgdynamic.info/assets/corp/fund_communications/pdf_publish/us-products/fact-sheet/F4854.pdf).

89. Interest income funds generally "invest in multiple debt type funds, including money market instruments, corporate or government bonds, etc." *See* https://www.dbs.com/digibank/in/articles/invest/what-is-an-income-fund, last accessed on August 14, 2025.

90. The KP Fund is a "collective trust," not a mutual fund. *See* KP Fund Fact Sheet ("This investment is not a mutual fund. It is a collective trust available only to tax-qualified plans and their eligible participants."). In simple terms, collective trusts pool plan participants' investments.

**2. Defendants Failed to Prudently Monitor the KP Fund**

91. Monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

92. Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit competitive bids.

93. The Plan's fiduciaries took no such steps. Had Defendants continually monitored and evaluated the KP Fund's rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds. Indeed, year after year, dating back to March 31, 1997, Defendants never strayed from the KP Fund, a sign that Defendants never attempted to evaluate the marketplace for prudent alternative options.

94. Defendants showed a bias toward keeping the KP Fund because the manager of the Kaiser Fund was Vanguard, which was also the trustee of the Plans, while an affiliate of Vanguard served as the Plans' recordkeeper. *See, e.g.*, Auditor's Report, attached to 2020 Form 5500 for the Supp. Plan, at 10 ("Certain plan investments are managed by an affiliate of Vanguard. Vanguard is the trustee of the Plan. An affiliate of Vanguard also serves as the recordkeeper. Transactions with the trustee and recordkeeper qualify as party-in- interest transactions.").

95. If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns, such as the Invesco Stable Asset Fund, MissionSquare Plus Fund, Putnum Stable Fund, Reliance MetLife Series, Galliard Stable Value Fund, NISA Stable Value, or even Lincoln Stable Value Account.

96. All these funds had the same investment objective of preserving principal and providing stable value returns with comparable levels of risk.

### 3. The KP Fund Materially Underperformed Relative to Comparator Collective Trusts

97. The KP Fund consistently materially underperformed industry-accepted benchmarks for collective trusts.

98. The KP Fund can be compared to various similar collective trusts ("Comparator Collective Trusts") as benchmarks. Suitable Comparator Collective Trusts include MissionSquare PLUS Fund Gross, the Putnam Stable Value Fund: 15bps, the Putnam Stable Value Fund: Gross, Reliance MetLife Series 25053 Cl 0, and Reliance MetLife Series 25053 Cl M. These five collective trusts are suitable Comparator Collective Trusts to the KP Trust because Morningstar, the most well respected and accepted financial industry fund database places all six funds in the US CIT Stable Value GR USD category ("Morningstar Category").

99. A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the KP Fund as early as the inception of the Class Period, or sooner, and on an ongoing basis, thereafter.

100. The performance of the KP Fund lagged behind the performance of the applicable Comparator Collective Trusts for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

101. The average returns, as early as 2018, prior to the Class Period, show that the KP Fund has been historically an imprudent selection. Here, five collective trusts from this Morningstar peer group, the Comparator Collective Trusts identified above, will be analyzed. As of the 2018, the average returns for the Comparator Collective Trusts were consistently superior to the KP Fund. The chart below analyzes these funds against the KP Fund as of 2018.

| **Investment** | **1 Year Return 1/1/2018 -12/31/2018** | **% of Underperformance** |
|---|---|---|
| **KP Fund** | **2.30** | |
| MissionSquare PLUS Fund Gross | 2.58 | 10.85% |
| Putnam Stable Value Fund: 15bps | 2.35 | 2.13% |
| Putnam Stable Value Fund: Gross | 2.51 | 8.37% |
| Reliance MetLife Series 25053 Cl 0 | 2.91 | 20.96% |
| Reliance MetLife Series 25053 Cl M | 2.91 | 20.96% |

| **Investment** | **1 Year Return 1/1/2019 -12/31/2019** | **% of Underperformance** |
|---|---|---|
| **KP Fund** | **2.55** | |
| MissionSquare PLUS Fund Gross | 2.76 | 7.61% |
| Putnam Stable Value Fund: 15bps | 2.55 | 0.00% |
| Putnam Stable Value Fund: Gross | 2.70 | 5.56% |
| Reliance MetLife Series 25053 Cl 0 | 2.88 | 11.46% |
| Reliance MetLife Series 25053 Cl M | 2.88 | 11.46% |

| **Investment** | **1 Year Return 1/1/2020 -12/31/2020** | **% of Underperformance** |
|---|---|---|
| **KP Fund** | **2.27** | |
| MissionSquare PLUS Fund Gross | 2.53 | 10.28% |

| | | |
|---|---|---|
| Putnam Stable Value Fund: 15bps | 2.54 | 10.63% |
| Putnam Stable Value Fund: Gross | 2.69 | 15.61% |
| Reliance MetLife Series 25053 Cl 0 | 2.34 | 2.99% |
| Reliance MetLife Series 25053 Cl M | 2.34 | 2.99% |

| Investment | 1 Year Return 1/1/2021 -12/31/2021 | % of Underperformance |
|---|---|---|
| **KP Fund** | **1.60** | |
| MissionSquare PLUS Fund Gross | 2.20 | 27.27% |
| Putnam Stable Value Fund: 15bps | 2.30 | 30.43% |
| Putnam Stable Value Fund: Gross | 2.46 | 34.96% |
| Reliance MetLife Series 25053 Cl 0 | 2.03 | 21.18% |
| Reliance MetLife Series 25053 Cl M | 2.03 | 21.18% |

| Investment | 1 Year Return 1/1/2022 -12/31/2022 | % of Underperformance |
|---|---|---|
| **KP Fund** | **1.75** | |
| MissionSquare PLUS Fund Gross | 2.28 | 23.25% |
| Putnam Stable Value Fund: 15bps | 2.49 | 29.72% |
| Putnam Stable Value Fund: Gross | 2.64 | 33.71% |
| Reliance MetLife Series 25053 Cl 0 | 2.48 | 29.44% |

| | | |
|---|---|---|
| Reliance MetLife Series 25053 Cl M | 2.48 | 29.44% |
| | | |
| **Investment** | **1 Year Return 1/1/2023 -12/31/2023** | **% of Underperformance** |
| **KP Fund** | **2.70** | |
| MissionSquare PLUS Fund Gross | 3.10 | 12.90% |
| Putnam Stable Value Fund: 15bps | 3.43 | 21.28% |
| Putnam Stable Value Fund: Gross | 3.58 | 24.58% |
| Reliance MetLife Series 25053 Cl 0 | 2.86 | 5.59% |
| Reliance MetLife Series 25053 Cl M | 2.85 | 5.26% |
| | | |
| **Investment** | **1 Year Return 1/1/2024 -12/31/2024** | **% of Underperformance** |
| **KP Fund** | **2.81** | |
| MissionSquare PLUS Fund Gross | 3.34 | 15.87% |
| Putnam Stable Value Fund: 15bps | 3.91 | 28.13% |
| Putnam Stable Value Fund: Gross | 4.07 | 30.96% |
| Reliance MetLife Series 25053 Cl 0 | 2.92 | 3.77% |
| Reliance MetLife Series 25053 Cl M | 2.93 | 4.10% |

102. Since 2018, and throughout the Class Period, the KP Fund underperformed the Comparator Collective Trusts on average by 16.91%, as demonstrated in the table below.

| Year | KP Fund One Year Average Return | Comparator Collective Trusts Average Return | KP Fund Percentage of Underperformance |
|---|---|---|---|
| 2018 | 2.30 | 2.65 | 13.21% |
| 2019 | 2.55 | 2.75 | 7.27% |
| 2020 | 2.27 | 2.49 | 8.84% |
| 2021 | 1.60 | 2.20 | 27.27% |
| 2022 | 1.75 | 2.47 | 29.15% |
| 2023 | 2.70 | 3.16 | 14.56% |
| 2024 | 2.81 | 3.43 | 18.08% |
| **Average Underperformance** | | | **16.91%** |

103. Given the substantial assets in the KP Fund, for example of over $300 million in just the Supp. Plan, an average underperformance of 16.91% is the equivalent of over **$48 million in losses** *each* year of the Class Period.

104. Clearly, analyzing data that would have been available to the Plan prior to the start of the Class Period and throughout the Class Period, the KP Fund was an imprudent selection. As of 2018, there were known superior performing alternatives which should have been selected. These alternatives are in the same style as the KP Fund, namely in the Morningstar US CIT Stable Value GR USD category. These five funds are just a few out of possibly a hundred or more funds in this category which would have been superior to the KP Fund.

### 4. The KP Fund Materially Underperformed Relative to Separate Account Funds

105. Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

106. Separate accounts are widely available to large plans such as the Plans, and offer a number of advantages over mutual funds, including the ability to negotiate fees.

107. The KP Fund can be compared to various separate account funds ("Comparator SA Funds") as benchmarks. Suitable Comparator SA Funds include Galliard Stable Value Composite Fund, Invesco Stable Value Fund, Lincoln Stable Value Account – 00KV4, Lincoln Stable Value Sep Acct Z448C, NISA Stable Value, and Putnam Stable Value Composite. These six separate account funds are suitable Comparator SA Funds to the KP Fund because they have similar characteristics to the collective trusts, such as the KP Fund.

108. The performance of the KP Fund lagged behind the performance of the applicable Comparator SA Funds for years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plans.

109. The six separate account funds, the Comparator SA Funds identified above, will be analyzed. As of 2018, the average returns for the Comparator SA Funds were consistently superior to the KP Fund. The chart below analyzes these funds against the KP Fund as of 2018.

| Investment | 1 Year Return 1/1/2018 -12/31/2018 | % of Underperformance |
|---|---|---|
| **KP Fund** | **2.30** | |
| Galliard Stable Value Composite Fund | 2.38 | 3.36% |
| Invesco Stable Value Fund | 2.46 | 6.50% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 42.50% |
| Lincoln Stable Value Sep Acct Z448C | 2.60 | 11.54% |
| NISA Stable Value Fund | 2.92 | 21.23% |
| Putnam Stable Value Composite Fund | 2.50 | 8.00% |
| [redacted] | | |

| Investment | 1 Year Return 1/1/2019 -12/31/2019 | % of Underperformance |
|---|---|---|
| **KP Fund** | **2.55** | |
| Galliard Stable Value Composite Fund | 2.68 | 4.85% |
| Invesco Stable Value Fund | 2.67 | 4.49% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 36.25% |
| Lincoln Stable Value Sep Acct Z448C | 2.70 | 5.56% |
| NISA Stable Value Fund | 3.04 | 16.12% |
| Putnam Stable Value Composite Fund | 2.70 | 5.56% |

| Investment | 1 Year Return 1/1/2020 -12/31/2020 | % of Underperformance |
|---|---|---|
| **KP Fund** | **2.27** | |
| Galliard Stable Value Composite Fund | 2.44 | 6.97% |
| Invesco Stable Value Fund | 2.37 | 4.22% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 43.25% |
| Lincoln Stable Value Sep Acct Z448C | 2.48 | 8.47% |
| NISA Stable Value Fund | 2.76 | 17.75% |
| Putnam Stable Value Composite Fund | 2.68 | 15.30% |

| Investment | 1 Year Return 1/1/2021 -12/31/2021 | % of Underperformance |
|---|---|---|
| **KP Fund** | **1.60** | |
| Galliard Stable Value Composite Fund | 1.85 | 13.51% |
| Invesco Stable Value Fund | 1.77 | 9.60% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 60.00% |
| Lincoln Stable Value Sep Acct Z448C | 2.10 | 23.81% |
| NISA Stable Value Fund | 2.32 | 31.03% |
| Putnam Stable Value Composite Fund | 2.47 | 35.22% |

| Investment | 1 Year Return 1/1/2022 -12/31/2022 | % of Underperformance |
|---|---|---|
| **KP Fund** | **1.75** | |
| Galliard Stable Value Composite Fund | 1.96 | 10.71% |
| Invesco Stable Value Fund | 1.94 | 9.79% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 56.25% |
| Lincoln Stable Value Sep Acct Z448C | 2.10 | 16.67% |
| NISA Stable Value Fund | 2.46 | 28.86% |
| Putnam Stable Value Composite Fund | 2.64 | 33.71% |

| Investment | 1 Year Return 1/1/2023 -12/31/2023 | % of Underperformance |
|---|---|---|
| **KP Fund** | **2.70** | |
| Galliard Stable Value Composite Fund | 2.84 | 4.93% |
| Invesco Stable Value Fund | 2.90 | 6.90% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 32.50% |
| Lincoln Stable Value Sep Acct Z448C | 3.18 | 15.09% |
| NISA Stable Value Fund | 3.12 | 13.46% |
| Putnam Stable Value Composite Fund | 3.58 | 24.58% |

| Investment | 1 Year Return 1/1/2024 -12/31/2024 | % of Underperformance |
|---|---|---|
| **KP Fund** | **2.81** | |
| Galliard Stable Value Composite Fund | 3.18 | 11.64% |
| Invesco Stable Value Fund | 3.16 | 11.08% |
| Lincoln Stable Value Account – 00KV4 | 4.00 | 29.75% |
| Lincoln Stable Value Sep Acct Z448C | 4.01 | 29.93% |
| NISA Stable Value Fund | 3.29 | 14.59% |
| Putnam Stable Value Composite Fund | 4.05 | 30.62% |

110. Since 2018, and throughout the Class Period, the KP Fund underperformed the Comparator SA Funds on average by 19.65% costing the Plans and participants tens of millions of dollars, as demonstrated in the table below.

| Year | KP Fund One Year Average Return | Comparator SA Funds Average Return | KP Fund Percentage of Underperformance |
|---|---|---|---|
| 2018 | 2.30 | 2.74 | 16.06% |
| 2019 | 2.55 | 2.91 | 12.37% |
| 2020 | 2.27 | 2.71 | 16.24% |
| 2021 | 1.60 | 2.30 | 30.43% |
| 2022 | 1.75 | 2.41 | 27.39% |
| 2023 | 2.70 | 3.19 | 15.36% |
| 2024 | 2.81 | 3.50 | 19.71% |
| Average Underperformance | | | 19.65% |

### 5. Defendants Should Have Known that Rates Would Increase by the Start of the Class Period

111. During the Class Period the KP Fund underperformed its comparators. However, there were other warning signs about the imprudence of the KP Fund.

112. Following the COVID-19 pandemic, in 2020 through 2021, and to counter the economic crisis resulting therefrom, the Federal Reserve implemented aggressive monetary easing policies, driving interest rates to historic lows.

113. However, by late 2021, inflation was well above the Federal Reserve's target and labor markets were nearing full employment.

114. In December 2021, the Federal Open Market Committee ("FOMC") signaled that it expected to raise interest rates in 2022.

115. In early 2022, the Federal Reserve began to aggressively raise interest rates in response to high inflation.

116. Defendants, as fiduciaries of the Plans, should have considered the economic environment when making investment decisions. Anticipating and witnessing interest rate increases is prudent when monitoring investments.

117. Market indicators demonstrated that expectations regarding interest rate increases began picking up significantly in 2022. This included interest rate increases of asset preservation investments such as stable value funds.

118. Defendants should have known that the KP Fund was not a prudent investment for the Plans' participants given its low interest rates compared to other similar stable value funds in the market. However, Defendants continued to maintain the KP Fund in the Plans and the participants suffered significant damages as a result.

**6. The KP Fund Performs Poorly Against its Benchmark**

119. The final nail in the coffin for the KP Fund, after the Plans' fiduciaries ignored all other red flags leading up to and during the Class Period, should have been the fact that the KP Fund was underperforming its own self-selected benchmark. Granted, the best and truest benchmark is the comparison of the KP Fund to other comparable funds throughout the Class Period, but the fact that the KP Fund underperformed its selected benchmark of the FTSE 3-Month US T-Bill Index the last few years was another red flag.

120. "The FTSE 3-Month US T Bill Index Series is intended to track the daily performance of 3-month US Treasury bills. The indexes are designed to operate as a reference rate for a series of funds." *See* FTSE 3-Month US T-Bill Index Series v2.1, date September 2024 (available at https://www.lseg.com/content/dam/ftse-russell/en_us/documents/ground-rules/ftse-3-month-us-t-bill-index-series-ground-rules.pdf).

121. The nature of the benchmark necessitates that the longest period of review by the Plans' fiduciaries should be at most every three months between reviews because the rates will not be reliable after three months.

122. The annual return for the KP Fund was 2.70 in 2023. *See* KP Fund Fact Sheet.

123. However, the FTSE 3-Month US T-Bill Index annual return was 5.26, more than double the annual return of the KP Fund. *See id*.

124. The KP Fund's underperformance continued into 2024. The annual return for the KP Fund in 2024 was 2.81. *See id*.

125. The FTSE 3-Month US T-Bill Index annual return for 2024 was 5.45 – again almost double the annual return of the KP Fund. *See id*.

126. This trend continued in 2025. The annual return for the KP Fund in 2025 was 3.08. The FTSE 3-Month US T-Bill Index annual return for 2025 was 4.40. *See id*.

127. Overall, as of December 31, 2025, the KP Fund had underperformed its benchmark for the last three (2.86% compared with 5.03%) and five-year periods (2.39% compared with 3.30%). *See id*.

128. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

129. A prudent fiduciary would have known that other substantially identical, better-performing stable value investments were available to the Plans' participants.

130. By maintaining the underperforming KP Fund, Defendants failed to provide participants with an option that maximized the value of their investments.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

131. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

132. At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

133. As fiduciaries of the Plans, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

134. The Prudence Defendants breached these fiduciary duties as discussed throughout this Complaint such as failing to make decisions regarding the performance of the funds in the Plans.

135. The failure to engage in an appropriate and prudent process resulted in saddling the Plans and its participants with poorly performing funds.

136. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses. Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

137. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In

addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

138. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Kaiser)**

139. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

140. Kaiser (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

141. In light of this authority, the Monitoring Defendant had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

142. The Monitoring Defendant also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Monitoring Defendant.

143. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things:

(a) Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as

the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b) failing to monitor the processes by which Plans investments were evaluated; and

(c) failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, all to the detriment of the Plans and the Plan participants' retirement savings.

144. As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

145. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plans all losses caused by its failure to adequately monitor the Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their

fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plans' fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: January 30, 2026

**CAPOZZI ADLER, P.C.**

*/s/ Mark K Gyandoh*

Mark K. Gyandoh, Esquire
(Admitted *Pro Hac Vice*)
PA Attorney ID # 88587
James A. Maro, Esquire
(Admitted *Pro Hac Vice*)
PA Attorney ID #86420
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Fax: (717) 233-4103
Email: markg@capozziadler.com
jamesm@capozziadler.com

**THE DLJ LAW FIRM, P.C.**
Dorian L. Jackson (Bar No. 269795)
3655 Torrance Boulevard, Suite 300
Torrance, CA 90503
Telephone: (310) 359-9203
Facsimile: (310) 359-9202
E-Mail: djackson@dljlawfirm.com

*Counsel for Plaintiff and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2026, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: *<u>/s/ Mark K. Gyandoh</u>*
Mark K. Gyandoh, Esq.